TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney
Chief, Criminal Division
CHRISTOPHER JONES (Cal. Bar. No. 343374)
MONIKA L. HARA (Cal. Bar No. 323017)
Assistant United States Attorneys
General Crimes Section
1200 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-7383 / (213) 894-3519
Facsimile: (213) 894-0141
Email: christopher.jones4@usdoj.gov
monika.hara@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDRIA DEMETRIUS AUGUSTINE,<br><br>Defendant. | No. 2:25-cr-00678-KS<br><br><u>GOVERNMENT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL</u><br><br>Bench Trial: April 14-15, 2026<br>Hon. Karen L. Stevenson |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Christopher Jones and Monika L. Hara, respectfully submits its proposed post-trial findings of fact and conclusions of law following the bench trial held on April 14 and April 15, 2026. For purposes of the bench trial, defendant Alexandria Augustine was charged with a violation of 41 C.F.R. § 102-74.385.

The findings of fact are based upon the evidence presented at the April 14-15, 2026 bench trial and, per the stipulation of the parties, the evidence admitted at defendant's prior jury trial on the 18 U.S.C. § 111(a) charge that was held between October 7-10, 2025. Dkt. 132. By this stipulation, the exhibits and testimony admitted in the October 2025 jury trial were admitted at the April 2026 bench trial. Additional exhibits and testimony were also admitted at the April 2026 bench trial.

## I. FINDINGS OF FACT

Roybal Federal Building and Apron

1. The Roybal Federal Building ("Roybal"), located at 255 East Temple Street, Los Angeles, California 90012, belongs to the federal government and is owned and operated by the General Services Administration ("GSA"). (4/14/26 Tr., GSA Civil Engineer Mark Woods, 28:6-17, 58:4-14.)[1] There is a loading dock, often referred to as the "apron," that extends from the Roybal building to Alameda Street. (Ex. 1.) Among other things, the apron serves as an entrance and exit for vehicles that enter and exit the Roybal building. Vehicles enter through vehicle barricades and typically drive into the loading dock entrance to enter the underground parking facility for Roybal (4/14/26 Tr., FPS Inspector Alexandro Gutierrez, 78:12-79:15; 10/9/25 Tr., FPS Inspector Lucas Riley, 33:23-34:3; Ex. 2.) The vehicle barricades are located inside the apron on federal property, up

[1] "4/14/26 Tr." and "4/15/26 Tr." refer to the April 2026 bench trial transcripts. Dkts. 141-142. "10/8/25 Tr." and "10/9/25 Tr." refer to October 2025 jury trial transcripts. Dkts. 109, 113. Each citation lists the date of testimony, witness's name, and transcript page/line numbers.

against the public sidewalk. (Ex. 2; 4/14/26 Tr., FPS Assistant Program Manager Sermons, 185:24-186:4.)

2. The apron is also federal property controlled by GSA. (4/14/26 Tr., Woods, 40:24-41:1; 10/8/25 Tr., Lucas Riley, 33:16-18.) In 1995, the American Land Title Association ("ALTA") conducted a survey of the land in and around Roybal. (Exs. 12, 13.) The survey depicts the federal property lines around the Roybal Building. (4/14/26 Tr., Woods, 30:14-31:8.) As testified to by GSA Civil Engineer Mark Woods based on his review of the survey and his personal review of the site, the federal property line begins ten feet from the curb of Alameda Street, plus or minus six inches. (4/14/26 Tr., Woods, 35:8-36:24; Ex. 13.) Similarly, the Federal Protective Service ("FPS") personnel who testified at both of the trials confirmed that the federal property line is demarcated by a horizontal line in the sidewalk that separates federal property from the sidewalk adjacent to Alameda Street. (10/8/25 Tr., Riley, 37:11-17; 10/8/25 Tr., Sermons, 132:17-19.) Indeed, there is no evidence in the record that the federal property line would be somewhere else.

3. FPS protects GSA-controlled facilities as law enforcement. (4/14/26 Tr., Sermons, 196:20-23; 10/8/25 Tr., Riley, 30:14-18.) This includes the Roybal Federal Building and the apron, and protecting them from civil disturbance and vandalism or destruction. (4/14/26 Tr., Sermons, 175:24-176:7; 4/14/26 Tr., Gutierrez, 72:22-73:8; 10/8/25 Tr., Riley, 35:6-12; 10/9/25 Tr., Gutierrez, 18:18-19:9.)

4. There are federal regulations that were promulgated to regulate GSA-owned facilities which were posted on the pillars of the Roybal loading dock facing the apron. (Exs. 3-5; 4/14/26 Tr.,

Gutierrez, 164:2-20.) These signs were present on July 24, 2025, and stated that individuals must comply with the lawful directions of FPS officers. (4/14/26 Tr., Sermons, 177:6-179:16; Exs. 3-5.) The presence of GSA signs, such as these, indicate property is maintained by GSA. (4/14/26 Tr., Woods, 64:18-24.)

5. There is a Veteran's Affairs ("VA") building adjacent to Roybal that is located on Temple Street and Alameda Street, with its front entrance on Temple Street. (4/14/26 Tr., FPD Investigator Foongy Lee, 254:7-15.) There are signs posted at the front entrance of the VA building on Temple Street which cite the Code of Federal Regulations promulgated to regulate VA property, which differ from the GSA regulations posted at the Roybal loading dock. (4/14/26 Tr., Lee, 256:23-258:5; Exs. 241, 244, 246.) There are no signs on the back side of the VA building facing the apron which cite Federal Regulations applicable to VA facilities. (4/14/26 Tr., Lee, 269:23-270:4; 272:5-273:12.) Rather, there are only two signs facing the apron – one which says "No emergency services, VA loading dock" and one on the VA door stating "This door is to remain closed at all times." (Exs. 236, 255; 4/14/26 Tr., Lee, 259:17-260:3.) These signs do not cite any federal laws and do not say anything about what the VA owns, does, or controls. (Exs. 236, 255; 4/14/26 Tr., Lee, 272:11-12, 273:9-11.) Additionally, there is no evidence of any officers from Veteran Affairs patrolling or protecting the apron. (4/14/26 Tr., Lee, 270:12-14.)

<u>Defendant's Arrest on July 24, 2025</u>

6. In summer 2025, groups of people frequently gathered on Alameda Street near the apron at Roybal ostensibly to protest the administration's immigration policies. (4/15/26 Tr., Defendant

Alexandria Augustine, 30:25-31:1; 4/14/26 Tr., Alissa Guzman, 276:9-19; 10/8/25 Tr., Sermons, 123:15-18.) When protestors did come on the apron, they would often retreat onto the city sidewalk if FPS officers walked towards them from the loading dock. (4/14/26 Tr., Guzman, 297:13-25.)

7. In June and July 2025, defendant Alexandria Augustine regularly protested at the Roybal apron. She described herself as an organizer, and was out there as often as she could be, including daily protests beginning July 11, 2025, and up the date of her arrest on July 24, 2025. (4/15/26 Tr., Augustine, 31:10-33:17.)

8. On July 24, 2025, defendant arrived at the apron around 7:00 p.m., with security camera footage showing her there by 8:01 p.m. (4/15/26 Tr., Augustine, 40:19-23, 46:12-17; Ex. 19; Ex. 20 at 1.)

9. On July 24, 2025, FPS ordered protestors to disperse and leave federal property, namely the Roybal apron, numerous times, both orally and via a long-range acoustic device ("LRAD") speaker system. (4/14/26 Tr., Sermons, 181:2-8; 181:12-20; 10/8/25 Tr., Riley, 90:13-20.) LRAD announcements are loud. (4/14/26, Tr., Gutierrez, 118:5-14; 4/14/26, Tr., Sermons, 218:22-219:1, 221:21-24.) Protestors were told that if they did not leave the apron, they would be subject to arrest or citation. (4/14/26 Tr., Sermons, 181:21-181:13.)

10. While on duty, FPS Assistant Program Manager ("APM") Sermons personally told protestors, including defendant, several times on July 24, 2025, to step back to the property line separating the Roybal apron from the sidewalk. (4/14/26 Tr., Sermons, 183:13-19; 10/8/25 Tr., Sermons, 138:17-22.) He told protestors to leave

federal property and specifically pointed them back to the public sidewalk. (4/14/26 Tr., Sermons, 182:15-24; 183:8-12.)

11. While on duty, FPS Inspector Gutierrez also personally told protestors four to five times after his shift began at 6 p.m. to not come on federal property. (4/14/26 Tr., Gutierrez, 116:2-117:10.)

12. LRAD warnings are typically issued to ask those on the apron to leave federal property and allow compliance before FPS officers engage more directly. (4/14/26 Tr., Sermons, 247:21-24; 248:12-17.)

13. According to an FPS dispatch log, FPS Inspector Degand issued warnings on the apron over an LRAD speaker system at 8:20 p.m., 8:31 p.m., 9:15 p.m., and 9:29 p.m. on July 24, 2025. (Ex. 216; 4/14/26 Tr., Sermons, 224:4-225:6; 226:2-13; 229:23-230:13; 231:22-232:18; 234:14-235:15; 236:11-20.) Both FPS APM Sermons and Inspector Gutierrez heard these warnings that evening. (4/14/26 Tr., Gutierrez, 117:12-119:9; 4/14/26 Tr., Sermons, 181:21-182:13.) Each warning advised protestors to stay off federal property or they would be subject to arrest. (Ex. 216 at 2-3, 13-15; 4/14/26, Tr., Gutierrez, 118:24-119:9.)

14. Defendant is seen on surveillance footage standing on the apron throughout the evening, including at 8:01 p.m., 8:17-8:19 p.m., 8:21 p.m., 8:29-8:30 p.m., and 9:28 p.m. (Exs. 19-20; 4/14/26 Tr., Sermons, 184:21-187:4; 4/15/26 Tr., Augustine, 46:18-47:10, 48:24-49:14, 50:1-13, 51:4-10.)

15. At approximately 10:40 p.m., a large crowd gathered on and near the apron. (Ex. 144; 4/14/26 Tr., Gutierrez, 80:3-11). FPS Officer Gutierrez told the crowd multiple times to step off of federal property. (4/14/26 Tr., Gutierrez, 80:3-11.) He

specifically saw and warned defendant, who was standing near a column that is on federal property designating the Metropolitan Detention Center, "You're next" to indicate that if she kept coming on federal property she would be detained. (Ex. 144; 4/14/26 Tr., Gutierrez, 80:3-23; 10/9/25 Tr., Gutierrez, 21:17-22:23.) Defendant responded, "Next for what, bitch?" multiple times. (Id.) Gutierrez again approached defendant, moving his hand to indicate she needed to step back off of federal property, and explained to defendant and those around her that if they kept coming on federal property they would be detained. (Ex. 144; 4/14/26 Tr., Gutierrez, 80:3-23; 82:16-83:12; 10/9/25 Tr., Gutierrez, 93:2-8, 104:7-16, 127:6-128:11.) Detainment can lead to the arrest of an individual. (4/14/26 Tr., Gutierrez, 168:3-17.)

16. At 11:20 p.m., approximately 39 minutes after the encounter with Gutierrez, a number of protestors came many feet onto the apron and flashed a high-powered flashlight at federal officers. (4/14/26 Tr., Gutierrez, 84:10-85:3; 10/9/25 Tr., Gutierrez, 23:5-24:12.) At the time, defendant was located on the far side of Alameda Street, on the other side of a large two-way street. (4/14/26 Tr., Gutierrez, 84:10-85:10.) Defendant proceeded to run from the far side of Alameda Street onto the apron, carrying an umbrella. (Ex. 6; Ex. 7; Ex. 19; Ex. 144; 4/15/26 Tr., Augustine, 66:25-67:22; 4/14/26 Tr., Gutierrez, 85:14-86:2; 10/8/25 Tr., Riley, 42:12-16.) Defendant ran approximately 5 to 10 feet onto federal property, past the vehicle barriers and bollards on the apron, which were marked with police "Do Not Cross" yellow tape at the time. (Ex. 9A-2; 4/14/26 Tr., Gutierrez, 87:7-89:3; 4/15/26 Tr., Augustine, 86:9-87:19, 94:5-16; 10/8/25 Tr., Riley, 42:17-19; 10/9/25 Tr., Gutierrez, 72:13-15.)

17. FPS officers approached the crowd of protestors that were well onto federal property. (10/9/25 Tr., Gutierrez, 23:2-24:12; Ex. 6.) Defendant thrusted an open umbrella between the protests and the officers purportedly in an attempt to shield the protestors from the officers. (10/9/25 Tr., Gutierrez, 23:2-24:12.) In order to regain visibility, Inspector Gutierrez grabbed the umbrella to move it out of the way and in doing so caused the fabric to be torn from the frame of the umbrella, , leaving defendant with the skeleton of the umbrella in her hand. (Id.) She proceeded to throw the skeleton at Inspector Gutirrez. (Id.; see also Exs. 8-10.) As a result, defendant was arrested for assault on a federal officer.

Defendant's Interactions with FPS Prior to July 24, 2025

18. Defendant saw the same officers at the apron almost every day in summer 2025. (4/15/26 Tr., Augustine, 31:10-33:17.) In July 2025, FPS Inspector Sermons was deployed to Roybal to protect the building and was stationed in the apron area on Alameda Street. (4/14/26 Tr., Sermons, 175:24-176:5.) Sermons encountered defendant protesting at the apron almost every day between July 9 and July 24, 2025. (4/14/26 Tr., Sermons, 187:22-188:5.)

19. Sermons believed he established a rapport with defendant because on several occasions prior to July 24, 2025, she had helped him get protestors off federal property and onto the sidewalk. (4/14/26 Tr., Sermons, 194:10-195:4, 196:2-5.) In these instances, Sermons had asked defendant for help and she complied. (4/14/26 Tr., Sermons, 195:14-196:1.) Defendant pulled protestors back across the line, off the apron and federal property so they would not get cited or arrested. (4/14/26 Tr., Sermons, 217:5-25.) Defendant also confirmed she had some good interactions with Sermons. (4/15/26 Tr.,

Augustine, 38:13-15.) Similarly, Ms. Guzman testified that defendant regularly attempted to de-escalate tensions between FPS and protestors. (4/14/26 Tr., Guzman, 295:24-296:7.)

20. During these prior interactions, Sermons had also told defendant not to be on federal property past the property line. (4/14/26 Tr., Sermons, 195:5-13.)

21. FPS Inspector Gutierrez was deployed to Roybal beginning in June 2025. (4/14/26 Tr., Gutierrez, 73:15-74:6.) During his shifts, Gutierrez saw defendant protest regularly at the apron prior to July 24, 2025, and identified her as one of the main organizers of the protests. (4/14/26 Tr., Gutierrez, 73:15-74:6.) He saw her both early in the morning and at night. On more than one occasion, Gutierrez spoke with defendant in the morning to say hello, and convey that FPS did not want any problems with the protestors. (4/14/26 Tr., Gutierrez, 74:7-75:6.) Gutierrez also asked defendant to tell other protestors in the group not to come onto federal property or they would be subject to arrest or detainment. (4/14/26 Tr., Gutierrez, 74:7-75:6.)

<u>Other Protestors Were Aware of Federal Property</u>

22. Notably, defense witnesses Mr. Solorio and Ms. Guzman were aware that the apron was federal property. (10/9/25 Tr., Octovio Solorio, 223:3-14, 223:20-25, 224:1-6, 225:4-13; 10/9/25 Tr., Guzman, 198:9-14, 198:22-24, 200:2-22.)

23. Similar to defendant, Mr. Solorio and Ms. Guzman regularly protested at the apron the month of July, interacted with defendant at protests, and were present the evening of July 24, 2025. (10/9/25 Tr., Solorio, 222:11-24; 10/9/25 Tr., Guzman, 187:11-188:3; 4/14/26 Tr., Guzman, 276:9-25.)

Defendant Testified at the October 2025 Jury Trial

24. Defendant initially testified that at the time of trial, she did not know that there was a property line or where the property line is located. (4/15/26 Tr., Augustine, 73:23-74:5.) Defendant subsequently admitted knowledge of the federal property line that is currently demarcated by a fence. (4/15/26 Tr., Augustine, 82:2-7.) Defendant admitted that when she ran across Alameda Street to join protestors the evening of July 24, 2025, they were behind the vehicle barricades, at least five feet onto federal property. (4/15/26 Tr., Augustine, 94:5-14.) When specifically asked if she was on federal property, she responded "yes." (4/15/26 Tr., Augustine, 94:15-16.)

25. Any finding of fact deemed to be a conclusion of law is hereby adopted into the Conclusions of Law.

## II. CONCLUSIONS OF LAW

### A. Elements of the Charged Offense: a Violation of 41 C.F.R. § 102-74.385

26. 41 C.F.R. § 102-74.385 makes it unlawful for a person to ignore "official signs of a prohibitory, regulatory or directory nature and with the lawful direction of Federal police officers and other authorized individuals." United States v. Bichsel, 395 F.3d 1053, 1056 (9th Cir. 2005).

27. This offense is not a specific intent crime, and the government need only show that defendant knowingly and willfully performed the proscribed conduct. See United States v. Brice, 926 F.2d 925, 929-30 (9th Cir. 1991).

28. To prove a violation of 41 C.F.R. § 102-74.385, the government must prove beyond a reasonable doubt that (1) defendant knowingly and willfully failed to follow official signs of a

prohibitory, regulatory or directory nature or the lawful direction of a Federal police officer or other authorized individual, (2) on property under the authority of GSA, and (3) the signs prohibiting such an act were conspicuously posted. 41 C.F.R. § 102-74.385. In the absence of conspicuous posting, however, actual notice establishes this element of the violation. Bichsel, 395 F.3d at 1057 (finding that verbal warnings given by federal officers to defendant of the exact conduct that was prohibited, even in the absence of conspicuous signs, was sufficient).

29. The Ninth Circuit has explained that "basic principles of due process" likely require that any "lawful direction" under 41 C.F.R. § 102-74.385 contain many or all of the following qualities: (1) "officers gave defendants an unambiguous command (often multiple times)"; (2) "officers ensured that the command was understood"; (3) "officers communicated that defendants would be arrested for failing to comply with an order"; and (4) "defendants were given a reasonable opportunity to comply." United States v. Huizar, 762 Fed. App'x 391, 392 (9th Cir. Feb. 27, 2019).

**B. The Roybal Apron is Property Under the Authority of GSA**

30. 41 C.F.R. § 102-74.385 applies to "all property under the authority of the General Services Administration (GSA) and to all persons entering in or on such property." 41 C.F.R. § 102-74.365.

31. The language of 41 C.F.R. § 102-74.385 and case law make clear that the property at issue need only be "under the authority" of the GSA, and proof of ownership is not required. In United States v. Radin, 2018 WL 1384514, at *4 (S.D.N.Y. Mar. 18, 2018), aff'd, 821 F. App'x 53 (2d Cir. 2020), for instance, the defendant challenged a conviction under 41 C.F.R. § 102-74.385 on the basis that a federal

courthouse was not owned by the federal government but rather leased from a city. The court rejected this argument, explaining that the argument "finds no support in common sense, ordinary understandings of property -- which admit of varying degrees of ownership and control -- or, most importantly, the regulations under which [defendant] was convicted," which applies to all property "under the authority" of GSA. Id. Accordingly, GSA need only exercise authority over the driveway or "apron" of the Roybal Federal Building, not own it or exercise exclusive control over it.

32. Here, as testified to by GSA Civil Engineer Mark Woods and FPS witnesses, the Roybal building and apron are federal property and are owned and operated by GSA. (4/14/26 Tr., GSA Civil Engineer Mark Woods, 28:6-17, 35:15-36:24; 40:24-41:1; 58:4-14; 10/8/25 Tr., Riley, 33:16-18, 37:11-17; 10/8/25 Tr., Sermons, 132:17-19; 10/9/25 Tr., Gutierrez, 22:3-11.) See United States v. Reardon, No. 6:25-CR-00227-01, 2026 WL 123302, at *6 (W.D. La. Jan. 16, 2026) (citing Moore v. United States, 254 F. App'x 603, 604 (9th Cir. 2007)) ("An individual charged with court security is competent to attest that federal business is conducted on the property.") The Roybal building and apron are therefore under the authority of the GSA.

33. As further evidence that the property was under the authority of the GSA, FPS was deployed to protect the Roybal apron throughout June and July 2025. (4/14/26 Tr., Sermons, 175:24-176:7; 4/14/26 Tr., Gutierrez, 72:22-73:8.) FPS provides support to GSA's federal properties. (4/14/26 Tr., Sermons, 196:20-23; 10/8/25 Tr., Riley, 30:14-18.) See United States v. Zagorovskaya, 2014 WL 12665158, at *2 (C.D. Cal. Oct. 8, 2014) ("FPS provides general law enforcement support to facilities that are owned, leased, and/or

operated by GSA.”), aff’d, 628 F. App’x 503 (9th Cir. 2015). Similarly, GSA regulations were posted on the pillars of the Roybal loading dock, facing the apron. (Exs. 3-5; 4/14/26 Tr., Gutierrez, 164:2-20; 4/14/26 Tr., Sermons, 177:6-179:16; 4/14/26 Tr., Woods, 64:18-24.)

34. The property was not under the authority of the VA. There were no VA signs facing the apron that denoted federal regulations or ownership. (4/14/26 Tr., Lee, 269:23-270:4; 272:5-237:12.) Instead, the two VA signs posted on the back of the VA building merely indicated the area was a loading dock with no emergency services, and that the back VA door was to remain closed at all times. (Exs. 236, 255; 4/14/26 Tr., Lee, 259:17-260:3.) Additionally, there is no evidence of any VA law enforcement patrolling or protecting the apron. (4/14/26 Tr., Lee, 270:12-14.)

35. The facts here are stronger than those of Zagorovskaya. There, the court noted that the FPS officer could “not confirm that the entire seventeenth floor is controlled by GSA,” but nonetheless found that there was sufficient evidence to infer GSA authority. Id. at *2, 4. What was conclusive in Zagorovskaya was that there were GSA regulations posted next to the elevator doors on the seventeenth floor. Id. at *4. Here, not only were GSA regulations posted on the pillars on the garage of the Roybal loading dock (which were right next to and within the apron area), but FPS also patrolled and protected the entire apron on behalf of GSA.

**C. Defendant Was on the Roybal Apron**

36. It is undisputed that on July 24, 2025, defendant protested on and around the Roybal apron. (4/15/26 Tr., Augustine, 31:10-33:17; 40:19-23, 46:12-17; Exs. 19-20.) Immediately preceding her

arrest, defendant ran onto the Roybal apron—approximately 5 to 10 feet into the area, carrying an umbrella. (Ex. 6; Exs. 8-10; Ex. 19; Ex. 144; 4/15/26 Tr., Augustine, 66:25-67:22, 86:9-87:19; 4/14/26 Tr., Gutierrez, 85:14-86:2, 87:7-89:3; 94:15-16; 10/8/25 Tr., Riley, 42:12-16.)

37. The testimony and evidence establish that GSA has authority over the Roybal apron where the charged conduct occurred. (Exs. 3-5, 236, 255; 4/14/26 Tr., Sermons, 175:24-176:7, 177:6-179:16, 196:20-23; 4/14/26 Tr., Gutierrez, 72:22-73:8, 164:2-20; 4/14/26 Tr., Woods, 28:6-17, 35:15-36:24; 40:24-41:1; 58:4-14, 64:18-24; 4/14/26 Tr., Lee, 259:17-260:3, 269:23-270:4, 270:12-14, 273:9-12; 10/9/25 Tr., Gutierrez, 18:18-19:9, 22:3-11; 10/8/25 Tr., Riley, 30:14-18, 33:16-18, 35:6-12, 37:11-17.) See Radin, 2018 WL 1384514, at *4; Zagorovskaya, 2014 WL 12665158, at *2.

**D. GSA Regulations Were Conspicuously Posted and Defendant Had Actual Notice**

38. "Within the meaning of a statute relating to the posting of notices, a 'conspicuous place' means one which is reasonably calculated to impart the information in question." Bichsel, 395 F.3d at 1055.

39. Here, the evidence shows that the GSA regulations – including 41 C.F.R. § 102-74.385, the regulation at issue here regarding following lawful directions of officers – were posted on the middle of the pillars of the Roybal loading dock on July 24, 2025. (Exs. 3-5; 4/14/26 Tr., Gutierrez, 164:2-20; 4/14/26 Tr., Sermons, 177:6-179:16.) As such, they were posted in a conspicuous place.

40. By contrast, the signs in Bichsel were not deemed to be posted in a "conspicuous place" because they were posted indoors and could not be seen by the defendant, who was outdoors. 395 F.3d at 1056.

41. Regardless, defendant had actual notice that she could not be on federal property, which independently establishes this element. Bichsel, 395 F.3d at 1057 (finding that verbal warnings given by federal officers to defendant of the exact conduct that was prohibited, even in the absence of conspicuous signs, was sufficient). As defendant testified, she protested regularly at the apron, almost every day. (4/15/26 Tr., Augustine, 31:10-33:17.) And FPS officers had ordered defendant to leave the apron on numerous occasions prior to July 24, 2025, and warned defendant that she could be arrested if she did not comply. (See, e.g., 4/14/26 Tr., Sermons, 195:5-13; 4/14/26 Tr., Gutierrez, 74:7-75:6.) In fact, defendant had previously helped APM Sermons to convince other protestors to leave federal property – demonstrating she was aware of what constituted federal property. (4/14/26 Tr., Sermons, 194:10-195:4, 196:2-5, 217:5-25.) This is consistent with (1) defendant's testimony that she had good interactions with APM Sermons, (2) defendant's testimony that she was not just a regular protestor but also an organizer, and (3) Ms. Guzman's testimony that defendant would regularly "de-escalate" tensions between FPS and protestors at the apron. (4/15/26 Tr., Augustine, 31:10-33:17, 38:13-15; 4/14/26 Tr., Guzman, 295:24-296:7.)

**E. Defendant Knowingly and Willingly Failed to Follow Lawful Directions**

42. FPS APM Sermons and Inspectors Degand and Gutierrez were federal officers engaged in their official duties of protecting the Roybal Building and the apron at the time orders were given to defendant to stay off of federal property. (4/14/26 Tr., Sermons, 175:24-176:7; 4/14/26 Tr., Gutierrez, 72:22-73:8; 10/8/25 Tr., Riley, 35:6-12; 10/9/25 Tr., Gutierrez, 18:18-19:9.) The test for determining whether an officer is engaged in the performance of official duties is whether the officer is acting within the scope of what he is employed to do, as distinguished from a personal frolic of his own. See United States v. Ornelas, 906 F.3d 1138, 1149 (9th Cir. 2018). Here, the orders issued by FPS personnel were within the scope of their employment because they were instructing personnel to stay off of federal property, which is within FPS's authority to prevent civil disturbance, vandalism, or destruction of federal property. (4/14/26 Tr., Sermons, 175:24-176:7; 4/14/26 Tr., Gutierrez, 72:22-73:8; 10/8/25 Tr., Riley, 35:6-12; 10/9/25 Tr., Gutierrez, 18:18-19:9.) Accordingly, the commands issued by FPS personnel were lawful because they were issued in furtherance of their official duties. Indeed, there is no indication in the records that FPS personnel are not permitted to instruct protestors to stay off of federal property.

43. The lawful commands given by FPS personnel satisfy the factors laid out in Huizar. Specifically, they gave unambiguous commands on multiple occasions — both on and prior to July 24, 2025 — to stay off federal property or potentially be detained and arrested. These included oral commands given by APM Sermons and Inspector

Gutierrez. (4/14/26 Tr., Sermons, 195:5-13; 4/14/26 Tr., Gutierrez, 74:7-75:6.) There were also four LRAD warnings – which are projected via a loudspeaker – issued on the evening on July 24, 2025 prior to defendant running onto federal property at approximately 11:23 p.m. (Ex. 216; 4/14/26 Tr., Sermons, 224:4-225:6; 226:2-13; 229:23-230:13; 231:22-232:18; 234:14-235:15; 236:11-20.) Critically, approximately 39 minutes before defendant ran on federal property, a large crowd gathered on and near the apron and Inspector Gutierrez told the crowd multiple times to step off of federal property. (Ex. 144; 4/14/26 Tr., Gutierrez, 80:3-11.) During this time, Inspector Gutierrez explicitly looked at defendant and told her "You're next" and, after defendant repeatedly asked "Next for what, bitch?" (Ex. 144; 4/14/26 Tr., Gutierrez, 80:3-23; 82:16-83:12; 10/9/25 Tr., Gutierrez, 93:2-8, 104:7-16, 127:6-128:11, 168:3-17.) Inspector Gutierrez turned around, walked a few steps back, and explained to the group where defendant was standing that if they came back on federal property – as protestors had done throughout the evening – that they would be detained, which can lead to arrest. (Id.)

44. Defendant was also well aware that she could not be on federal property prior to July 24, 2025. For instance, defendant – who acknowledged she was an organizer of the protestors – repeatedly helped APM Sermons get other protestors off of federal property and back onto the sidewalk so that they would not get cited or arrested. (4/14/26 Tr., Sermons, 194:10-195:4, 195:14-196:1, 196:2-5, 217:5-25; 4/15/26 Tr., Augustine, 31:10-33:17.)

45. Thus, FPS officers warned defendant repeatedly, well before she ran on property under the authority of the GSA at 11:23 p.m. on July 24, 2025, that she was not permitted on the property, and that

crossing onto the property could lead to her arrest. Nonetheless, defendant knowingly and willfully failed to follow those orders and ran onto property under the authority of GSA.

46. Any conclusion of law deemed to be a finding of fact is hereby incorporated into the Findings of Fact.

**F. CONCLUSION**

47. Based on the evidence presented at trial, the Court finds that the government has proven beyond a reasonable doubt each of the elements of a violation of 41 C.F.R. § 102-74.385. The Court finds defendant guilty of Count Two of the Second Superseding Information.

IT IS SO ORDERED.

______________________ ____________________________

DATE

HON. KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE